IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-60727
Summary Calendar

_____


SUSAN MILLER, widow of James Michael
Miller; JAMES MICHAEL MILLER, II,
minor child; JAMIE MICHELLE MILLER,
minor child; NANCY JO MILLER, minor
child,

                                                    Petitioners,

versus

LAKE ARTHUR SHIPYARD; LIBERTY MUTUAL
INSURANCE COMPANY; DIRECTOR, OFFICE OF
WORKERS'S COMPENSATION PROGRAMS,
U.S. DEPARTMENT OF LABOR,

                                                    Respondents.

_____

Petition For Review of an Order
of the Benefits Review Board
_____
(93-1956)
May 21, 1998

Before JOLLY, BENAVIDES, and PARKER, Circuit Judges.

PER CURIAM:[*]

     Petitioners Susan Miller, widow of James Michael Miller, and

Mr. Miller's three minor children, James Michael Miller, II, Jamie

Michelle Miller, and Nancy Jo Miller appeal the Benefits Review

Board's ("BRB") affirmance of the Administrative Law Judge's

_____

     [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

("ALJ") decision denying their claims under the Longshoremen and Harbor Worker's Compensation Act ("LHWCA"), 33 U.S.C. §§ 901, et seq. Finding no error, we affirm.

I

James Miller fell and injured his back on October 15, 1980, while employed as a painter at Lake Arthur Shipyards. He immediately began receiving weekly LHWCA benefits in the amount of $300 per week, which the respondent initially calculated from an average weekly wage of $450 per week.[1] Mr. Miller underwent five back surgeries between April 1981 and March 1987, and was hospitalized on numerous occasions due to severe back pain and severe hypertension. Liberty Mutual, Lake Arthur Shipyards's insurer, paid for each operation and hospitalization, but later recalculated and reduced Mr. Miller's LHWCA payments to $160.93 per week on July 28, 1983. It maintained that payment schedule, without annual step increases, until Mr. Miller's death on May 20, 1989, at which time Liberty Mutual terminated all benefits.

II

The Millers filed claims for death benefits and increased disability compensation under the LHWCA. An ALJ held a formal hearing and concluded that the respondents correctly determined Mr.

---

[1]This amount was later determined to be an overpayment, which the ALJ permitted Liberty Mutual to utilize as a set-off against any liability determined in favor of the Millers.

Miller's compensation rate of $160.93 under 33 U.S.C. § 910(c). The ALJ further determined that Mr. Miller was permanently totally disabled as of May 14, 1985, and thus entitled to annual step increases in his compensation rate after that date, but that the respondents could offset their liability for the increases against their prior overpayments. The ALJ also held that none of Mr. Miller's later falls and injuries were caused by the October 1980 work-related fall and subsequent back injury. Furthermore, Mr. Miller's irresponsible physical conduct and a 1985 injury were determined to constitute intervening causes of Mr. Miller's ultimate total disability. Thus, the ALJ held that the respondents were discharged from any liability for medical benefits or disability compensation arising from the October 1985 injury. Finally, the ALJ determined that the petitioners were not due death benefits because any causal relationship between the October 1980 work-related injury and Mr. Miller's death in 1989 of a heart attack was too tenuous to support such a finding of liability. The BRB affirmed the ALJ's decision pursuant to the provisions of Public Law 104-134.[2] The petitioners now appeal.

III

_____

[2]Public Law 104-134 provides that appeals to the BRB that have been pending for more than one year shall be considered affirmed by the Board if not acted upon before September 12, 1996. See Omnibus Appropriations for Fiscal Year 1996, Pub.L. No. 104-134, § 101(d), 110 Stat. 1321-219 (enacted 1996).

We review a decision of the BRB under the same standard it employs to review a decision of the ALJ[3]:  whether the decision contains any errors of law and if the factual findings are supported by substantial evidence.  New Thoughts Finishing Co. v. Chilton, 118 F.3d 1028, 1030 (5th Cir. 1997); Mendoza v. Marine Personnel Co., 46 F.3d 498, 500 (5th Cir. 1995).  "Substantial evidence is evidence that provides 'a substantial basis of fact from which the fact in issue can be reasonably inferred . . . more than a scintilla . . . more than create a suspicion . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Avondale Indus., Inc. v. Director, Office of Workers' Compensation Programs, 977 F.2d 186, 189 (5th Cir. 1992) (quoting cases).  This evidentiary standard is less exacting than the preponderance of the evidence standard.  Chilton, 118 F.3d at 1030 (citing Avondale, 977 F.2d at 189).

Moreover, as the fact-finder, the ALJ may consider all credibility inferences and his "selection among inferences is conclusive if supported by the evidence and the law."  Mendoza, 46 F.3d at 500; Chilton, 118 F.3d at 1030 (noting ALJ's decision need not constitute sole inference that may be drawn from facts).  We may not reweigh the evidence or substitute our judgment for that of

_____

[3]Since the BRB actually issued no written findings of fact or conclusions of law, see supra note 2, our references shall be to the written opinion issued by the ALJ.

4

the ALJ.  SGS Control Servs. v. Director, Office of Worker's Compensation Programs, 86 F.3d 438, 440 (5th Cir. 1996).  Finally, as is directly pertinent to one issue in this case, the ALJ may accept any part of an expert's testimony or reject it entirely. Mendoza, 46 F.3d at 501.

IV

A

The petitioners complain that the ALJ erred in his calculations of Miller's average weekly wage.  The ALJ utilized the formula provided in 33 U.S.C. § 910(c) to uphold the respondents' reduction of weekly benefits from $300 to $160.93.  The ALJ did so after discounting the testimony of the petitioners' rehabilitation specialist, Mr. Glenn M. Hebert, and concluding that Mr. Miller's W-2 form was the only credible evidence of income.  The petitioners contend that § 910(b) sets out the more proper standard.  Section 910 provides in relevant part:

> Except as otherwise provided in this chapter, the average weekly wage of the injured employee at the time of the injury shall be taken as the basis upon which to compute compensation and shall be determined as follows:

> (b) If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings, if a six-day worker, shall consist of three hundred times the average daily wage or salary, and, if a five-day worker, two hundred and sixty times the average daily wage or salary, which an employee of the same class working substantially the whole of such immediately preceding year in the same or in similar employment in the same or a neighboring place

5

shall have earned in such employment during the days when so employed.

    (c) If either of the foregoing methods of arriving at the average annual earnings of the injured employee cannot reasonably and fairly be applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the services of the employee if engaged in self-employment, shall reasonably represent the annual earning capacity of the injured employee.

33 U.S.C. § 910.

The petitioners contend that the evidence they submitted in the hearing before the ALJ allows the use of subsection 910(b) for the calculation of Mr. Miller's average earnings and that Fifth Circuit law, as set out in Newport Shipbuilding & Repair, Inc. v. Roundtree, permits the use of 910(c) only when neither (a) nor (b) may be applied fairly and reasonably. 698 F.2d 743 (5th Cir. 1983). Glenn M. Hebert, accepted as an expert witness for the petitioners, testified as to the reasonable average weekly wage of a shipyard spray painter in southern Louisiana for 1979 through 1981. The petitioners submit that the ALJ's reliance on Mr. Miller's one-week paycheck under the formula set out in § 910(c) was error in the light of this expert testimony.

The parties agree that subsection (a), which relies upon the employee's wages during the prior year, is inapplicable because Mr.

6

Miller was not employed as a shipyard spray painter "during substantially the whole of the year immediately preceding his injury." 33 U.S.C. § 910(a). Subsection (b) bases its method of calculation upon the prior year's wages of coworkers who performed the same or similar work. Subsection (c), in contrast with (a) and (b), looks not to the actual prior wages, but to the employee's earnings potential at the time of injury. Roundtree, 698 F.2d at 745.

We have interpreted the statutory framework of § 910 of the LHWCA to indicate a congressional intent to favor as a method of calculating an employee's average weekly wage that formula set out in (a) over that in (b), (b) over (c), and (c) to be utilized as a "catch-all" when neither (a) nor (b) may be "reasonably and fairly" applied. SGS Control Servs. v. Director, Office of Worker's Compensation Programs, 86 F.3d 438, 441 (5th Cir. 1996); Empire United Stevedores v. Gatlin, 936 F.2d 819, 821 (5th Cir. 1991); Roundtree, 698 F.2d at 748-49. Thus, we have deemed subsection (c) appropriate when the employee's work is seasonal or otherwise intermittent and when "'otherwise harsh results' would follow were an employee's wages invariably calculated simply by looking at the previous year's earnings." Gatlin, 936 F.2d at 822; Roundtree, 698 F.2d at 750-51. We have also noted approvingly the use of subsection (c) when the proper application of subsections (a) and

7

(b) is stymied by the presentation of insufficient evidence at the hearing.  Roundtree, 698 F.2d at 751.

The ALJ determined that the petitioners failed to present sufficiently concrete evidence to permit the application of (a) or (b).  As noted earlier, subsection (b) requires proof of the average daily wage of an employee "of the same class" who worked substantially the entire immediately preceding year "in the same or in similar employment in the same or a neighboring place."  33 U.S.C. § 910(c).  The ALJ discredited Hebert's testimony as "too vague, too speculative, and too lacking in specificity and other indicia of reliability to provide either a reliable basis for [those] basic and critical premises or to provide the requisite evidentiary concreteness."  This determination by the ALJ was not error.

Hebert based his testimony--that $450 per week was the reasonable average weekly wage for shipyard spray painters in 1979 and 1980--on telephone surveys that he conducted of shipyards in southern Louisiana.  He testified that he telephoned six specific shipyards in Louisiana and Mississippi, spoke with different individuals in the shipyards' personnel offices, and inquired of that person's present recollection of industry conditions in 1979 and 1980.  Some of the individuals had been employed in the personnel offices in 1980 and others had not.  He also testified

that he obtained certain employment data from the Baton Rouge Research and Development Section of the Louisiana State Employment Security office. Hebert failed to consider Miller's actual wages and hours when employed by the Lake Arthur Shipyard, nor did he review any actual earnings records.[4] Furthermore, the ALJ noted that he did not reference the actual wage records of any specific shipyard employee whose employment might have been comparable to Miller's.

Hebert's research and testimony is insufficient to demonstrate the specifics required under subsection (b). There is no proof that the data gathered by Hebert pertains to an employee (1) "of the same class" as Miller, (2) who worked "substantially the whole of such immediately preceding year" (3) "in the same or in similar employment" (4) "in the same or a neighboring place." The ALJ properly discounted Hebert's testimony as providing an insufficient basis for application of subsection (b). Based on the evidence that was before him, the ALJ correctly determined that subsection (c) provided the appropriate formula for calculating Miller's annual wages.

B

---

[4]Evidence of even one worker's pay records would have fulfilled the statutory requirement. Roundtree, 698 F.2d at 750.

The petitioners contend, in the alternative, that Hebert's testimony concerning wages of shipyard sprayers in 1979 and 1980 should be employed under the calculation set out in (c). They maintain that Hebert's figures, integrated into subsection (c)'s formula, also produce an annual wage of $450 per week.

Subsection (c) focuses on the injured employee's earning capacity at the time he sustained his injury. "[T]he ALJ must make a fair and accurate assessment of the injured employee's earning capacity--the amount that the employee would have the potential and opportunity of earning absent the injury." Gatlin, 936 F.2d at 823. The ALJ may look to three sources of information in determining the employee's potential for earnings: (1) the injured employee's previous earnings in the employment he held at the time of injury; (2) previous earnings of other employees in the "same or most similar class" who enjoyed the "same or most similar employment in the same or neighboring locality"; and (3) the injured employee's previous earnings from other employment. 33 U.S.C. § 910(c). Unlike subsections (a) and (b), subsection (c) does not premise the average weekly wage calculation solely on the actual earnings of the employee or of other similarly situated employees, but merely provides that such evidence is one of several possible factors to be considered. Gatlin, 936 F.2d at 823.

10

The ALJ noted these considerations, but ultimately determined that Mr. Miller's record of employment for eight days with the shipyard was the only credible evidence of earnings in the case. The petitioners presented no substantial evidence of Mr. Miller's earnings (or willingness to work) prior to his employment by the shipyard, nor any evidence of what might have prevented him from working. The ALJ had previously discounted Hebert's testimony as too speculative and we again find no error in this decision. The only credible evidence of earnings before the ALJ consisted of Mr. Miller's W-2 forms memorializing his eight days of employment with Lake Arthur Shipyard. We deem this proof sufficient to support the ALJ's determination of Mr. Miller's average weekly wage under the formula prescribed in subsection (c). Thus, the determination that Miller's average weekly wage was $241.41, resulting in a temporary total disability compensation rate of $160.93, is supported by substantial evidence.

C

i

The petitioners maintain that the ALJ correctly determined that Mr. Miller was totally permanently disabled as of May 14, 1985, and that this classification entitled him to annual step

increases from that date until his death in 1989.[5]  They assert, however, that the increases should be calculated from a beginning benefits rate of $300 per week.  The ALJ determined that Mr. Miller was entitled to compensation for permanent total disability resulting from his 1980 work-related injury at the rate of $160.93[6] per week with annual step increases beginning October 1985 through October 1988.[7]  The ALJ further held, however, that the respondents could offset their liability for the annual increases against their initial overpayments from 1980 until 1983.

ii

The respondents challenge the ALJ's determination that Mr. Miller suffered a compensable total permanent disability because of a work-related injury.[8]  The ALJ's determinations are supported by

_____

[5]Section 10(f) provides for annual step increases in the amount of disability compensation upon proof of permanent total disability.  33 U.S.C. § 910(f).  The respondents never classified Mr. Miller as permanently disabled and thus never increased his rate of compensation.

[6]We have already held that the ALJ's determination that Mr. Miller's average weekly wage was $160.93 is supported by substantial evidence and we decline to readdress this issue.

[7]Where warranted, the LHWCA provides for annual increases effective October 1 of any particular year.  33 U.S.C. § 910(f)(1).

[8]From the record before this court, it appears that the respondents did not petition this court for review.  The governing statutory provision provides that
> Any person adversely affected or aggrieved by a final
> order of the Board may obtain a review of that order in
> the United States court of appeals for the circuit in

> which the injury occurred, by filing in such court within sixty days following the issuance of such Board order a written petition praying that the order be modified or set aside.

33 U.S.C. § 921(c); see also 20 C.F.R. § 802.410(a) ("Within 60 days after a decision by the Board has been filed . . ., any party adversely affected or aggrieved by such decision may file a petition for review with the appropriate U.S. Court of Appeals . . . ."). The filing of a petition by an appropriate party provides this court with jurisdiction over the proceeding and we "have the power to give a decree affirming, modifying, or setting aside, in whole or in part, the order of the Board and enforcing same to the extent that such order is affirmed or modified." 33 U.S.C. § 921(c).

The question facing this court is whether we have jurisdiction under the LHWCA to grant relief to a party that did not petition for review. The respondents were adversely affected by the ALJ's determination that Mr. Miller was entitled to step increases, but they failed to follow the process statutorily outlined for them to receive relief--they did not file a petition. This failure appears to be fatal to their request for relief from the ALJ's determination.

Not only does the language of the Code and the regulations quoted supra support this interpretation, but the federal rules of appellate procedure reinforce our view. Rule 15 sets out the procedure for gaining review of an agency order. Fed.R.App.P. 15; see Ingalls Shipbuilding v. Director, OWCP, 117 S.Ct. 796, 806 (1997) ("Rule 15(a) clearly applies to appeals from the Benefits Review Board . . . ."). The rule provides that a petition must be filed with the clerk of the appropriate court of appeals, that the petition must *name each party seeking review*, that the petition must designate the respondent "*and the order or part thereof to be reviewed.*" Fed.R.App.P. 15(a). Based on the language of the law before us, and on the analogous situation when a party fails to file a notice of appeal, it appears that we are without jurisdiction to grant relief to the non-petitioning respondents. See Fed.R.App.P. 4; Marts v. Hines, 117 F.3d 1504, 1506-19 (5th Cir. 1997) (Garwood, J., dissenting).

Nevertheless, as the parties did not brief this issue and our own research unearthed no controlling precedent, we may pretermit the jurisdictional issue because the respondents' challenge is meritless, as discussed infra. United States v. McGill, 74 F.3d 64, 66 (5th Cir. 1996); United States v. Weathersby, 958 F.2d 65,

13

substantial evidence and the respondents are entitled to no relief on the merits. The ALJ concluded that Mr. Miller reached maximum medical improvement after his 1980 work-related injury on May 14, 1985. Two physicians determined that Mr. Miller suffered a 25% impairment to his whole body as of 1985, and this evidence was not contradicted by the respondents. Dr. Phillips, an orthopedic surgeon, noted Mr. Miller's 25% impairment after an examination in April 1984 and further determined that Mr. Miller would not be able to return to his prior employment. Dr. Gunderson, an orthopedic surgeon and Mr. Miller's treating physician, posited that Mr. Miller reached maximum medical improvement as of May 14, 1985, and similarly assigned a 25% disability to Mr. Miller's whole body. Substantial evidence thus supports the ALJ's determination that Mr. Miller reached maximum medical improvement on May 14, 1985, and that he suffered under a 25% permanent impairment to his whole body.

---

66 (5th Cir. 1992) (citing Norton v. Mathews, 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976) ("'In the past, we similarly have reserved difficult questions of our jurisdiction when the case alternatively could be resolved on the merits in favor of the same party.'"), quoted in Texas Employers' Ins. Ass'n v. Jackson, 862 F.2d 491, 497 n.8 (5th Cir. 1988) (en banc), cert. denied, 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 404 (1989)); Pierce v. Winograd, 757 F.2d 714, 716 (5th Cir. 1985) (pretermitting mootness issue); Koehring Co. V. Hyde Constr. Co., 324 F.2d 295, 296 (5th Cir. 1963) (pretermitting jurisdictional question).

The ALJ further held that the permanent impairment resulted from Mr. Miller's 1980 work-related injury and was thus compensable. The LHWCA provides for compensation to be paid to an employee who suffers an accidental injury or death that arises out of and in the course of employment. 33 U.S.C. §§ 902(2), 903. The test is one of causation in fact--whether the employment caused the injury. Shell Offshore, Inc. v. Director, Office of Worker's Compensation Programs, 122 F.3d 312, 316 (5th Cir. 1997); Bludworth Shipyard, Inc. v. Lira, et al., 700 F.2d 1046, 1049 (5th Cir. 1983). Proximate cause, as that concept is employed in tort law, is generally not applicable in the LHWCA setting. Shell Offshore, 122 F.3d at 316; Bludworth Shipyard, 700 F.2d at 1050.

> This is because proximate cause analysis in a typical tort case focuses on the question whether a party, in the conduct of his everyday affairs, should be held legally responsible for remote consequences of his acts. The inquiry under the LHWCA is much narrower. The court's sole function is to determine whether the injury complained of was one "arising out of" the employment. Once causation in fact is established, with only a few exceptions, the court's function is at an end.

Bludworth Shipyard, 700 F.2d at 1050.

The allegation of a supervening, independent cause of the claimed injury is one such exception. Shell Offshore, 122 F.3d at 316; Bludworth Shipyard, 700 F.2d at 1050. We have previously noted that this Circuit has articulated different definitions of what may constitute a supervening, independent cause. Shell

15

<u>Offshore</u>, 122 F.3d at 316. One standard requires an influence originating entirely outside of employment that effectively overpowers and nullifies the initial injury. <u>Id.</u> (citing <u>Voris v. Texas Employers Ins. Ass'n</u>, 190 F.2d 929, 934 (5th Cir. 1951)). The second standard allows for severance of causation if the subsequent event merely "worsens" the initial injury. <u>Id.</u> (citing <u>Mississippi Coast Marine v. Bosarge</u>, 637 F.2d 994, 1000 (5th Cir. 1981)).

The ALJ determined that no supervening, independent cause contributed to Mr. Miller's impairment before May 14, 1985, and that Mr. Miller's 25% permanent disability therefore constituted a compensable injury. This finding is supported by substantial evidence under either standard. Mr. Miller's initial back injury focused at the L4-5 and L5-S1 levels. Although Mr. Miller suffered subsequent injuries after the October 1980 injury and before May 14, 1985, none disrupted the causation chain or expanded his initial injury outside the originally affected back area. Substantial evidence supports the ALJ's determination that Mr. Miller was permanently partially disabled as of May 14, 1985, and that the disability arose out of and in the course of his employment.

Due to the permanent partial disability, the ALJ further concluded that Mr. Miller could not return to his prior employment.

16

This finding, supported by substantial evidence, made a prima facie case for legal total disability. SGS Control Servs., 86 F.3d at 444; Louisiana Ins. Guar. Ass'n v. Abbott, 40 F.3d 122, 126 (5th Cir. 1994) ("Whereas maximum medical improvement is the indication of permanent versus temporary disability, the availability of suitable alternative employment distinguishes partial from total disability."; citing 33 U.S.C. §902(10)). In order to lessen their compensation liability, the burden then shifted to the respondents to demonstrate that Mr. Miller could have performed suitable alternative work or that such employment was available. SGS Control Servs., 86 F.3d at 444 (noting employer must establish employee is "capable of performing . . . other realistically available jobs"). They presented no such evidence. Thus, Mr. Miller, although only medically permanently *partially* disabled as of May 14, 1985, became legally entitled to *total* disability benefits as of that date. Id.; Abbott, 40 F.3d at 126; see also Phillips v. Marine Concrete Structures, Inc., 895 F.2d 1033, 1035 (5th Cir. 1990) (en banc) (noting LHWCA does not provide for 10(f) adjustments for period of temporary total disability). The ALJ's decision awarding the petitioners permanent total disability benefits as of May 14, 1985, is supported by substantial evidence.[9]

---

[9]After May 1985, Mr. Miller suffered subsequent injuries and endured several operations that ultimately left him physically

17

The petitioners' final argument is that Mr. Miller's 1980 work-related injury had a sufficient causal relationship to his death nine years later to warrant payment of death benefits. The cause of death was hypertensive and atherosclerotic cardiovascular disease. The petitioners' argument proceeds in the following manner: Miller suffered a work injury that aggravated his pain; the pain increased his high blood pressure; the high blood pressure aggravated his pre-existing atherosclerotic disease; the aggravation of his disease in turn hastened his death.

The LHWCA provides that compensation be paid for "death arising out of and in the course of employment." 33 U.S.C. § 902(2). Some of our older cases have held that an injury that merely hastens death may be regarded as actually causing it. Calbeck v. Strachan Shipping Co., 306 F.2d 693, 695 (5th Cir. 1962); Southern Stevedoring Co. v. Henderson, 175 F.2d 863, 866

---

permanently totally disabled as of July 17, 1987. Specifically, the ALJ determined that Mr. Miller injured his back in October 1985 at the L3-4 level, that this injury was not work-related, and that it constituted a supervening cause of Mr. Miller's ultimate permanent total disability. Mr. Miller exacerbated the October 1985 injury with intentional misconduct such as lifting a washing machine, a 35-pound amplifier, and a refrigerator. The ALJ held that this misconduct also acted as supervening causes. Shell Offshore, 122 F.3d at 316. The ALJ thus determined that the respondents were not liable for compensation related to the 1985 injury at the L3-4 level. This finding is supported by substantial evidence.

(5th Cir. 1949) ("since to hasten one's death is to cause it"). Thus, it appears that the petitioners would be entitled to death benefits if Mr. Miller's 1980 work-related injury hastened his death.

The ALJ found no such causal relation and we must determine whether that finding is supported by substantial evidence. The ALJ relied to a significant degree on the observations of Dr. Lawrence O'Meallie, a board-certified internist and cardiac specialist. Dr. O'Meallie, the only cardiologist who rendered an opinion in this case, stated that there was no causal relationship between Mr. Miller's exacerbated hypertension and his death. The heart specialist posited that Mr. Miller's underlying coronary disease--atherosclerosis--caused his death. He stated that it is "the underlying disease process [of hypertension] that's causing the acceleration of the coronary disease, not the back that's causing the blood pressure that's causing the atherosclerosis." He concluded that even if Mr. Miller's back pain did cause his blood pressure to increase episodically, any evidence of a causal relationship between those increases and Mr. Miller's sudden death was too speculative to warrant imposition of liability.

Dr. O'Meallie's opinion directly contradicted those of Mr. Miller's treating physicians, Dr. Grovenburg and Dr. Shirley. Both of those physicians submitted that Mr. Miller's severe back pain

19

increased his hypertension which, in turn, aggravated the heart disease that eventually killed him. The ALJ noted, however, that the record contained no evidence indicating that Mr. Miller's hypertension was diagnosed as medically significant between 1980 and October 1985. As previously noted, Mr. Miller suffered an supervening back injury in October 1985 at the L3-4 level. Dr. Grovenburg did not treat Mr. Miller for severe labile hypertension until 1988 and 1989--after Mr. Miller's supervening 1985 injury and his flagrant physical misconduct. Thus, the ALJ determined that even if Mr. Miller's back pain was causally related to his death, supervening incidents destroyed any causal relationship between his 1980 work-related incident and his back pain suffered after his nonwork-related injury of October 1985. See Mendoza, 46 F.3d at 501 ("[W]here the testimony of medical experts is at issue, the ALJ is entitled to accept any part of an expert's testimony or reject it completely.").

Finally, the ALJ noted that nine years had passed between the 1980 injury to Mr. Miller's back and his death in 1989. Based on the evidence before him, the ALJ deemed any causal relation too tenuous to support an award of death benefits. This finding is supported by substantial evidence.

E

20

Substantial evidence supports the ALJ's denial of the respondents' request for section 8(f) relief.  33 U.S.C. § 908(f).

V

The ALJ's determinations are supported by substantial evidence and, for the foregoing reasons, the decision of the Benefits Review Board is

A F F I R M E D.